UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JUNIOR FRED BLACKSTON,

                    Petitioner,

v.                                              CASE NO. 2:09-cv-14766
                                                HONORABLE ARTHUR J. TARNOW
LLOYD W. RAPELJE,

                    Respondent.
_____/

**OPINION AND ORDER**
**CONDITIONALLY GRANTING THE PETITION**
**FOR A WRIT OF HABEAS CORPUS**

Petitioner Junior Fred Blackston has filed a *pro se* habeas corpus petition challenging his

Van Buren County conviction for first-degree murder.  The Court has determined that

Petitioner's Sixth Amendment right of confrontation and his Fourteenth Amendment right to due

process were violated by the trial court's refusal to permit Petitioner to impeach the prior

testimony of two key prosecution witnesses with their recanting statements.  Therefore, the

petition will be conditionally granted.

## I.  BACKGROUND

### A.  The State Court Trials

Petitioner's conviction arose from the murder of Charles Miller (Miller) near the border

between Van Buren and Allegan Counties on September 12 or 13, 1988.  The crime went

unsolved for twelve years.  In the year 2000, a "cold case" team of law enforcement officials

began to re-interview witnesses.  Petitioner, Guy Carl Simpson (Simpson), and Charles Dean

Lamp (Lamp) were implicated in the crime.  Simpson offered testimony pursuant to the

*Blackston v Rapelje*, 09-14766

prosecutor's investigative subpoena and was granted immunity from prosecution in return for his

testimony against Petitioner.

Lamp led the police to a grave in a wooded area behind his residence where Miller's

skeletal remains were found.  He pleaded guilty to manslaughter and was sentenced to

imprisonment for ten to fifteen years.

Petitioner was tried before a jury in Van Buren County Circuit Court.  On April 13, 2001,

the jury found him guilty, as charged, of first-degree (premeditated) murder.  *See* Mich. Comp.

Laws § 750.316(1)(a).  Petitioner moved for a new trial on the ground that the trial court

misinformed his jury about the extent of the prosecution's grant of immunity to Simpson.  The

trial court agreed with Petitioner and granted him a new trial.  Petitioner was re-tried in October

of 2002.  The evidence at the second trial has been summarized by the state court as follows:

> At this second trial, Simpson appeared in court, but resisted giving
> testimony.  He was found to be unavailable, and the court admitted his testimony
> from the first trial together with an instruction clarifying the prosecutor's grant of
> immunity.  A written statement Simpson had given after the first trial, in which he
> recanted his testimony, explained why he had testified as he had, and stated that
> only he and Lamp were with Miller when he was killed, was not admitted.
>
> According to Simpson's testimony at the first trial, which was read to the
> jury at the second trial, on the evening of September 12, 1988 Simpson was
> dropped off at the home of defendant and defendant's then girlfriend, Darlene
> (Rhodes) Zantello, for an unannounced visit sometime between 10:00 and 10:30
> p.m.  When Simpson arrived, defendant and his one-year-old daughter were at
> home, and Zantello may have been there at that time as well.  Miller also was at
> defendant's house when Simpson arrived.  Between one-half hour and one hour
> after Simpson arrived, Lamp, who was also a friend of defendant's, and whom
> Simpson did not like, arrived at defendant's home.  Lamp announced that he
> wanted to steal some marijuana from a field he knew about.  Miller was known to
> have a knack for finding marijuana plants, and Simpson assumed that it had been
> planned in advance that Miller would go with Lamp and defendant to get the
> marijuana.  Defendant originally stated that he could not go because he had to

2

*Blackston v Rapelje*, 09-14766

stay with his daughter, since Zantello had left by then, and suggested that
Simpson accompany Lamp and Miller in his stead.  Eventually, however, all four
men, together with defendant's daughter, left the home to go steal the marijuana.

Lamp drove into the woods, driving around for approximately forty-five
minutes before turning off onto an unpaved "two-track" road and stopping.  All
four men got out, while the child was left sleeping in the car, and Lamp took a
rifle out of the trunk of his car and handed it to defendant. Lamp walked off some
distance ahead of the others, allegedly to look for the field, while defendant,
Miller, and Simpson followed behind.  Shortly thereafter, Lamp called out that he
had found the field, and at that point defendant turned and shot Miller one time,
and Miller fell to the ground, apparently dead.  Lamp then rejoined Simpson and
defendant, and Simpson and Lamp moved Miller's body to a nearby, pre-dug
grave and placed Miller in the grave.  Defendant then jumped down into the grave
and returned a moment later with something in his hand, which Simpson believed
to be one of Miller's ears.  Lamp then filled in and disguised the grave, and the
three men returned in Lamp's car, along with defendant's daughter, to defendant's
home.  Approximately one half-hour later Lamp left to go home, while Simpson
remained at defendant's home for the remainder of the night.

Simpson testified that several days after the murder Lamp told him that
they had killed Miller because Miller had "gotten in over his head with the wrong
people."  Simpson testified that defendant told him that he needed to show
Miller's ear to Benny Williams.  Several days after the murder, Simpson was with
defendant when he took a bag, which Simpson believed contained Miller's ear,
and threw it in a nearby river.

Simpson admitted that in the past he had told several different versions of
the events surrounding Miller's disappearance, including that only he (Simpson)
and Lamp, and not defendant, were involved in Miller's death; that an entirely
different person, Charles Pippin, committed the crime; and that Miller was not
really dead, but rather was simply working in another state.  Simpson admitted
that he had made his statements with an eye to his own personal gain, and further
admitted that if he testified to a different set of events at defendant's trial, he
would probably lose his grant of immunity and would risk perjury charges.
Simpson also confirmed that Lamp had, in the past, threatened to kill him if he
gave any information regarding Miller's murder to the police or if he endangered
Lamp's own plea-agreement in any way.

Simpson's testimony as to the events surrounding Miller's death was
largely corroborated by Lamp.  Lamp, who was testifying pursuant to a
plea-bargain under which he was permitted to plead guilty [to] manslaughter and

3

receive a ten to fifteen year sentence in exchange for his testimony, testified that defendant was angry with Miller because he believed Miller was planning to rob Benny Williams, a local drug dealer who supplied defendant with cocaine.  As a result, Lamp and defendant had discussed killing Miller three or four times, and ultimately they decided to take Miller out to a pre-selected, isolated area on the pretext of stealing marijuana, and to shoot him and bury his body in a pre-dug grave.  The two men located an appropriate area not far from where Lamp then lived, off an unpaved two-track road, and several nights before Miller's murder they prepared a grave at this location, with both Lamp and defendant taking turns digging.

Lamp testified that on the night of Miller's murder, he drove to defendant's house, and when he arrived he found that not only was defendant there, but Simpson was present as well.  Lamp was not happy that Simpson was there, because they did not like each other, but defendant took him aside and informed him that Simpson was going to assist in the murder. Approximately a half-hour after Lamp arrived, Miller was dropped off at defendant's house, and then the four men, together with defendant's daughter, got into Lamp's car and drove to the pre-selected site.  As previously planned by Lamp and defendant, when they arrived at the site, Lamp handed defendant a rifle, which he took from the trunk of the car, and then Lamp walked alone ahead of the others to find the pre-dug grave. When he found the grave, he shouted back to the others and then he heard a single gunshot.  He then went back to the others, where he found Miller lying on the ground with blood seeping from the back of his head and defendant holding the rifle in his hands.  Lamp, Simpson, and defendant carried Miller's body to the awaiting grave, defendant jumped in and cut off Miller's ear, and then the three men filled in the grave and disguised it so that it would not be discovered.  Lamp stated that he subsequently sold the rifle.

Lamp confirmed that he had once threatened to kill Simpson when he found out Simpson was wearing a hidden wire in an attempt to incriminate Lamp and defendant, but insisted it was merely an idle threat and that he had no intention of ever following through on it.

Rebecca (Krause) Mock, Miller's girlfriend at the time of his death, and her sister Roxanne (Krause) Barr, who lived with Miller and Mock at the time Miller was killed, both testified that defendant admitted being present at Miller's murder, although their testimony differed with regard to whether defendant admitted shooting Miller.

Darlene Zantello, formerly Darlene Rhodes, who was defendant's girlfriend at the time of Miller's death, was called to the stand by the prosecution,

but denied having any memory of the events of the night Miller died, her prior
statements to police, her prior testimony, or an affidavit she signed after the first
trial.  The court established through questioning that Zantello had been an
alcoholic for many years, and had suffered head injuries.  The court found
Zantello to be unavailable as a witness, pursuant to MRE 804, and permitted the
prosecution to read Zantello's testimony from defendant's first trial into the
record.

At the first trial, Zantello testified that she lived with defendant in
September 1988, that she was pregnant at that time, that on the night of Miller's
death she had experienced severe stomach pains and had gone to the hospital.
Zantello testified that she spent three or four hours at the hospital before returning
home to find the house empty.  After unsuccessfully trying to locate her daughter
at a friend's, she laid down and fell asleep.  She was awakened some time later
when defendant and Simpson returned to the house.  Zantello testified that she
heard Simpson say something to defendant like "that was like a movie with all
that blood," and that she very vaguely recalled someone saying something
regarding someone's ear being cut off.  She also had a vague recollection of
Simpson saying something about almost blowing someone's whole head off and
about a pre-dug hole.  Zantello testified that when Miller's girlfriend, Mock, came
to the house looking for him, defendant denied any knowledge of his
whereabouts.  A year or two later, however, after Zantello and defendant had
broken up, defendant came over to Zantello's house where Mock was then living.
He became weepy and said he was sorry that "they did what they did," but he did
not say that he himself had done anything.

Following the reading of her testimony into the record, Zantello was
recalled to the stand.  On cross-examination she denied any recollection of telling
police in 1988 and 1990 that defendant was at home when she returned from the
hospital.  When defense counsel began to question her regarding the affidavit
executed after the first trial in which she stated that her first statement to the
police was true and her testimony at trial was not, the trial court stopped the
questioning on the basis that the affidavit was executed after the first trial, and
therefore was not a *prior* inconsistent statement.

Three of defendant's sisters, Shirley Gargus, Sheila Blackston, and Linda
Johnson, each testified as to defendant's whereabouts on the night of Miller's
murder and confirmed Zantello's assertion that she went to the hospital that night.
Gargus testified that on September 12, 1988 around 11:00 p.m. Sheila Blackston
stopped by to leave her children for Gargus to baby-sit.  Blackston had Zantello
with her, and told Gargus that she was taking Zantello to the hospital for stomach
pain.  Around midnight, Blackston called her from the hospital and asked her to

*Blackston v Rapelje*, 09-14766

go check on defendant, since he had been left alone with his and Zantello's one-year-old baby. When she arrived at defendant's house a few minutes later defendant and the baby were at home.

Blackston confirmed Gargus' testimony, stating that on September 12, 1988 she took Zantello to the hospital around 11:00 p.m. for stomach pain, and dropped her own children off with Gargus on the way to the hospital. When she returned Zantello to Zantello's and defendant's home after leaving the hospital, defendant was at home.

Johnson testified that on September 12, 1988 she got into a fight with her husband and went over to defendant's house around 11:30 p.m. to calm down. She stated that when she arrived, defendant and the baby were at the house alone, asserted that the only visitor during the time she was at defendant's house was defendant's friend Lonnie Johnson, who visited for approximately twenty minutes around midnight, and told the court that when she left defendant's home at around 12:45 a.m. defendant was still at home.

Defendant also called Benny Williams. Williams asserted that he had not known Miller, that he had never asked anyone to kill Miller, that he did not know anything about Miller's death, and that no one had ever brought him a human ear. Williams did admit, however, that in 1988 he was a cocaine dealer in Bangor. A police officer had earlier testified that the police concluded that Williams was not involved in the murder.

The prosecution's experts expressed the opinion that Miller died from a gunshot wound to the neck. Defendant's experts expressed the opinion that Miller's injuries were caused by blunt force trauma.

*People v. Blackston*, No. 245099, 2005 WL 94796, at *1-4 (Mich. Ct. App. Jan. 18, 2005)

(unpublished).

There was no physical evidence linking Petitioner to the crime and, as noted, he

presented an alibi defense at trial. His version of the facts was that Lamp and Simpson took

Charles Miller to a wooded area behind Lamp's home where Lamp hit Miller on the back of his

head with a shovel and buried him. The jury rejected the defense theory and, on October 17,

*Blackston v Rapelje*, 09-14766

2002, found Petitioner guilty, as charged, of first-degree murder.  On November 12, 2002, the

trial court sentenced Petitioner to life imprisonment.

**B.  The Second Motion for New Trial and Subsequent Appeals**

Petitioner argued in a subsequent motion for new trial that the trial court abused its

discretion by barring him from impeaching the prior-recorded testimony of Simpson and Darlene

Rhodes Zantello (Zantello) with their recanting statements.  The recantations were made after

Petitioner's first trial, but before his second trial.  The trial court denied Petitioner's motion on

the grounds that the recanting statements were suspect and their probative value was outweighed

by undue prejudice.  The court also noted that Simpson was a manipulative person and that his

recanting statement was self-serving.  As for Zantello, the court was troubled by the fact that

Zantello claimed to have a loss of memory just seventy-seven days after she signed her affidavit

and her allegations would have been subject to cross-examination by the prosecutor.

In an appeal of right, Petitioner raised four claims through counsel and eight claims in a

*pro se* supplemental brief.  The Michigan Court of Appeals determined that the trial court erred

in denying Petitioner the right to impeach Simpson's and Zantello's prior testimony with their

recanting statements and with the testimony of other witnesses who would have said that

Simpson made prior inconsistent statements that only he and Lamp were involved in the murder.

After concluding that the error was not harmless, the court of appeals reversed Petitioner's

conviction and remanded his case for a new trial.  *See id.*  The State appealed to the Michigan

Supreme Court, which vacated the judgment of the Court of Appeals and remanded the case for

7

*Blackston v Rapelje*, 09-14766

consideration of whether any error was harmless beyond a reasonable doubt in light of the untainted evidence. *See People v. Blackston*, 474 Mich. 915 (2005).[1]

On remand, the Michigan Court of Appeals once again concluded that the trial court's exclusion of evidence was error and that the error was not harmless beyond a reasonable doubt. The court of appeals reversed Petitioner's conviction and remanded his case for a new trial. *See People v. Blackston (on remand)*, No. 245099, 2007 WL 1553688 (Mich. Ct. App. May 24, 2007) (unpublished).

The Michigan Supreme Court reversed the Court of Appeals a second time, holding that the trial court did not abuse its discretion when it denied Petitioner's motion for new trial and that any error was harmless. The state supreme court remanded the case to the Michigan Court of Appeals for consideration of Petitioner's remaining claims. *See People v. Blackston*, 481 Mich. 451 (2008).[2]

The Michigan Court of Appeals found no merit in Petitioner's remaining claims and affirmed his conviction. *See People v. Blackston (on second remand)*, No. 245099, 2008 WL 4604393 (Mich. Ct. App. Oct. 7, 2008) (unpublished). Petitioner appealed, but on May 1, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Blackston*, 483 Mich. 986 (2009) (table).[3]

---

[1] Justices Michael F. Cavanagh and Marilyn J. Kelly voted to deny leave to appeal.

[2] Justice Stephen J. Markman filed a dissenting opinion, which Justices Michael F. Cavanagh and Marilyn J. Kelly joined. They voted to affirm the judgment of the Court of Appeals and to remand the case for a new trial.

[3] Then-Chief Justice Marilyn J. Kelly and Justice Stephen J. Markman concurred in the Supreme Court's decision to deny leave to appeal. Although they maintained that the trial court

**C. The Habeas Petition and Responsive Pleading**

Petitioner filed his habeas corpus petition on December 8, 2009.  He claims that: (1-2) the trial court abused its discretion and violated his right of confrontation when it ruled that he could not impeach Simpson's and Zantello's prior testimony with their inconsistent recanting statements; (3) the trial court abused its discretion when it determined that Simpson was unavailable at the second trial; (4) trial counsel was ineffective for failing to object to (a) Zantello's hearsay testimony, (b) a jury instruction on perjury, and (c) a jury instruction on the order of deliberations; (5) the second trial violated the Double Jeopardy Clauses of the state and federal constitutions; (6) appellate counsel was ineffective for failing to move to dismiss the murder charge with prejudice;  (7) the trial court abused its discretion and violated his right of confrontation when it admitted Simpson's former testimony; (8) the trial court abused its discretion and violated his right to a fair trial when it admitted Simpson's prior testimony without deleting the discussion about Simpson's immunity agreement; (9) the trial court abused its discretion and violated his right of confrontation when it declared Zantello unavailable and admitted her former testimony; (10) the trial court abused its discretion and deprived him of due process and a fair trial when it excluded evidence from several potential defense witnesses who could have testified about Lamp's and Simpson's prior inconsistent statements; (11) the prosecutor committed misconduct when he vouched for his witnesses and characterized Petitioner as a cold-blooded murderer; (12) trial counsel was ineffective for failing to (a) move

---

abused its discretion in excluding the two witnesses' recanting statements and that the error was not harmless, they acknowledged that they had not prevailed, and they agreed with the majority of justices that Petitioner's remaining issues lacked merit.

*Blackston v Rapelje*, 09-14766

to dismiss the murder charge with prejudice, (b) object to several trial errors, (c) cross-examine and impeach key prosecution witnesses with their prior inconsistent statements; (d) question Shirley Gargus about Zantello's inconsistent statements; (e) produce defense witnesses to impeach Zantello and Simpson with their inconsistent statements, and (f) offer character evidence to show that Zantello and Lamp had a reputation for dishonesty; and (13) the cumulative effect of trial errors deprived him of his right to due process and a fair trial.

The Michigan Supreme Court was the last state court to adjudicate Petitioner's claims regarding the trial court's denial of his request to admit evidence of Simpson's and Zantello's recantations. The Michigan Court of Appeals was the last state court to issue a reasoned opinion on Petitioner's remaining claims.

Respondent argues in an answer to the habeas petition filed through counsel that Petitioner did not exhaust state remedies for a due process argument that he makes in his eighth claim. *See* 28 U.S.C. § 2254(b)(1)(A) (stating that a state prisoner's habeas corpus petition shall not be granted unless it appears that the petitioner exhausted the remedies available in state court).

The eighth habeas claim reads:

The trial court abused its discretion and violated the defendant's state and federal constitutional rights to due process and a fair trial when it admitted the prior testimony of Guy Carl Simpson into evidence at the second trial without deleting the references in the testimony where Simpson and the court expressed confusion over the immunity agreement.

10

*Blackston v Rapelje*, 09-14766

Pet. at 32.  In his discussion of this claim, Petitioner asserts that he was prejudiced by the trial court's reference to his first trial.  It is this aspect of Petitioner's claim that Respondent contends was not raised in the state courts and, therefore, is unexhausted.

"A claim is 'fairly presented' for exhaustion purposes where the petitioner presented both the factual and legal basis for his claim to the state courts." *Hanna v. Ishee*, __ F.3d __, __, No. 09-3360, 2012 WL 3932047, at *6 (6th Cir. Sept. 11, 2012) (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987)). Petitioner styled his argument as a due process claim in state court in the same way that he does here.  Although his *pro se* supplemental brief in state court did not address the trial court's reference to the "first trial," this is not a case where "the factual basis supporting his argument[] has changed dramatically" from the claim presented to the state courts.  *Cf. Hanna*, 2012 WL 3932047, at *9.  The Court therefore concludes that Petitioner has satisfied the exhaustion requirement.

Respondent also argues that Petitioner's eighth claim, as well as his fifth and eleventh claims, are procedurally defaulted.  A procedural default is not a jurisdictional limitation, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010), and the claims that Respondent asserts are procedurally defaulted lack merit.  Further, it is more efficient to address the merits of Petitioner's claims than to analyze whether they are procedurally defaulted.  The Court, therefore, excuses the alleged procedural defaults and will proceed to address the substantive merits of Petitioner's claims, using the following standard of review.

*Blackston v Rapelje*, 09-14766

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act

of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court factual

determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable

application occurs" when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case."  *Id*. at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly.  Rather, that

application must also be unreasonable."  *Id*. at 410-11.

12

*Blackston v Rapelje*, 09-14766

## III.  DISCUSSION

**A.  The Denial of Petitioner's Request to Impeach Simpson and Zantello with their Recanting Statements** (habeas claims one and two)

Simpson and Zantello testified for the prosecution at Petitioner's first trial, but  recanted their testimony in written statements before Petitioner's second trial.  For various reasons, the trial court determined that both Simpson and Zantello were unavailable to testify at the second trial and that their testimony from Petitioner's first trial could be read into the record.  Petitioner sought permission to impeach Simpson's and Zantello's prior testimony with their subsequent recantations, but the trial court denied his request.

Petitioner claims that the trial court abused its discretion and violated his right of confrontation by not permitting him to impeach Simpson's and Zantello's prior testimony with their recanting statements.  The Michigan Court of Appeals twice determined on the basis of state law that the trial court erred in excluding Simpson's and Zantello's recantations and that the error was not harmless.[4]  A majority of Michigan Supreme Court justices, however, reversed the court of appeals.  The state supreme court held that the trial court did not abuse its discretion and that any error was harmless, given the volume of untainted evidence against Petitioner and the cumulative nature of the recantations.

---

[4]  The court of appeals did not decide whether the error was of constitutional magnitude.

13

*Blackston v Rapelje*, 09-14766

**1. Clearly Established Federal Law**

 **a. Whether the State Court's Opinion is Entitled to Deference**

  The deferential AEDPA standard of review applies to claims "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). In Petitioner's case, the state courts resolved Petitioner's first and second claims on the merits, but on the basis of state law. The state courts did not directly address Petitioner's claim under the Confrontation Clause, but in *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 784-85 (2011), the Supreme Court stated that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principle to the contrary."

  The Michigan Supreme Court did not base its decision on a state-law procedural principle, but it also did not discuss the constitutional aspect of Petitioner's claim, nor reach a conclusion as to whether the alleged error was constitutional or nonconstitutional error. This Court finds it unnecessary to decide whether the state supreme court adjudicated Petitioner's Confrontation-Clause claim "on the merits," because the Court would reach the same result whether the Court deferred to the state court's decision or reviewed the issue *de novo*. *Cf. Cotto v. Herbert*, 331 F.3d 217, 252-53 (2d Cir. 2003) (declining to decide whether the state court's ruling on a Sixth Amendment claim was an "adjudication on the merits" within the meaning of § 2254(d), because the court would reach the same result under a *de novo* standard of review).

14

*Blackston v Rapelje*, 09-14766

### b.  The Confrontation Clause

The Confrontation Clause of the Sixth Amendment guarantees defendants in criminal prosecutions "the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  The Clause is applicable to the States through the Fourteenth Amendment," *Idaho v. Wright*, 497 U.S. 805, 813 (1990), and a primary interest secured by the Clause is the right of cross-examination, *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).  Cross-examination "has traditionally been allowed to impeach, i.e., discredit" witnesses.  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

The rights to confront and to cross-examine witnesses also are essential to a criminal defendant's right to due process, the essence of which, is the right to defend against the State's accusations.  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

> Or course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.  But its denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined.

*Id*. at 295 (internal and end citations omitted).

### 2.  Application

### a.  The Trial Testimony and Recanting Statements

The jurors at Petitioner's trial heard Simpson's and Zantello's testimony from Petitioner's first trial where Simpson testified that, on September 12, 1988, he, Petitioner, Lamp, and Miller drove down a two-track road into the woods, ostensibly in search of marijuana. When they arrived at their destination, everyone got of the car, and Lamp handed a gun to

15

*Blackston v Rapelje*, 09-14766

Petitioner.  Lamp led the way as they walked further into the woods.  Lamp subsequently

indicated that he had found something.  Petitioner then turned and shot Miller, who fell to the

ground.  Simpson and Lamp placed Miller's body in a pre-dug hole.  Petitioner stepped in the

hole and cut off Miller's ear with a knife.  After the hole was filled with dirt and concealed,

Simpson, Petitioner, and Lamp went back to the car and returned to Petitioner's home.

Petitioner informed Simpson the following morning that he had to show Miller's ear to Bennie

Williams.  (Tr. Apr. 12, 2001, at 44-98.)

Simpson stated in an unsworn statement dated March 29, 2002, that he saw Lamp hit Mr.

Miller in the head with a shovel and then shoot Miller.  Simpson also stated that Petitioner never

left home that night and that he (Simpson) previously implicated Petitioner under pressure from

law enforcement officials.

Zantello testified at Petitioner's first trial that Petitioner was selling marijuana and

cocaine out of their home in September of 1988 and that Bennie Williams supplied Petitioner

with the cocaine.  On the night in question, she left for the hospital as Miller arrived at her and

Petitioner's house.  Simpson and Zantello's one-year old daughter also were there.  Three or four

hours later when she returned home, no one was there.  She laid down and dozed.  The next thing

she remembered hearing was Petitioner and Simpson come in the house.  Simpson said

something like, "Boy, that was just like in a movie, all that blood" and "You almost blew his

whole head off."  She also vaguely recalled hearing something about someone's ear being cut

off.

16

*Blackston v Rapelje*, 09-14766

Zantello continued her testimony by explaining that, in 1990 or 1991 after Petitioner had moved out of the house and Becky Krause had moved in, Petitioner came to the house and said that he was sorry for what they did and that he felt badly about it. She and Becky convinced Petitioner to call the police and turn himself in, but by the time the police arrived, Petitioner had changed his mind. He never indicated that he himself had done anything; nor did he indicate who did it. (Tr. Apr. 10, 2001, at 186-208.)

Zantello stated in an affidavit dated July 31, 2002, that her testimony at Petitioner's first trial was not true and that, when she got home from the hospital on the night of September 12, 1988, only Petitioner and her daughter were there. Zantello also stated in her affidavit that she did not hear Petitioner and Simpson discuss a murder and that Petitioner had always maintained he was not involved in Miller's death. She claimed that her boyfriend in 2001 pressured her to testify against Petitioner because the boyfriend was trying to please the prosecutor to avoid being sent to prison for unrelated felony charges against him.

### b. Analysis

Michigan Rule of Evidence 806 provides:

When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

17

*Blackston v Rapelje*, 09-14766

This rule provided a basis for impeaching Simpson and Zantello with their recanting statements. Petitioner's defense, moreover, was that he was at home when the murder occurred and that Lamp hit Miller on the head with a blunt object and buried him. Simpson's and Zantello's recanting statements were consistent with the defense theory, and "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [Simpson's and Zantello's] testimony which provided 'a crucial link'" in the prosecution's proofs. *Davis*, 415 U.S. at 317 (quoting *Douglas*, 380 U.S. at 419). "The accuracy and truthfulness of [Simpson's and Zantello's] testimony were key elements in the State's case against Petitioner," and, by denying Petitioner an opportunity to show that Simpson and Zantello recanted their prior trial testimony, the trial court deprived Petitioner of the right to impeach Simpson's and Zantello's trial testimony.

Defense counsel was permitted to cross-examine Simpson about his prior statements in which he stated that only he and Lamp were involved in the killing, that some else killed Miller, and that Miller was still alive in 1988. (Tr. Apr. 12, 2001, at 106-07.) Defense counsel also was permitted to question Simpson about his immunity agreement, the fact that he could lose his immunity if he testified differently from his former testimony, and that Lamp had threatened to kill Simpson if he jeopardized Lamp's plea agreement. (*Id*. at 108-13.) And defense counsel was permitted to ask Zantello about a statement to the police in which she stated that Petitioner was not involved in the murder. (Tr. Apr. 10, 2001, at 217.)

But counsel was not permitted to show that Simpson and Zantello had recanted their trial testimony. The limited cross-examination that defense counsel was permitted to conduct was not

18

*Blackston v Rapelje*, 09-14766

adequate to develop the credibility issue properly for the jury. Petitioner was not allowed "to 'sift [the witnesses'] conscience[s] so that the jury might judge for itself whether [the] testimony was worthy of belief." *Chambers*, 410 U.S. at 295.          Petitioner had a right "to seek out the truth in the process of defending himself," and he "should have been permitted to expose . . . facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness[es]." *Davis*, 415 U.S. at 320 and 318. Because he did not have an adequate opportunity to impeach Simpson's and Zantello's prior testimony, he was deprived of his constitutional right of confrontation. The exclusion of critical evidence deprived Petitioner of a fair trial, "a trial in accord with traditional and fundamental standards of due process." *Chambers*, 410 U.S. at 302.

### 3. Harmless Error Analysis

The question remains whether the constitutional error was harmless. The Michigan Court of Appeals concluded that the error was not harmless, but the Michigan Supreme Court concluded that it was harmless.

Violations of the Confrontation Clause are subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Vasquez v. Davis*, 496 F.3d 564, 574 (6th Cir. 2007). Habeas relief may be granted if a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial

19

*Blackston v Rapelje*, 09-14766

and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

Whether a violation of the Confrontation Clause was harmless error depends on a number of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Simpson's and Zantello's testimony was important to the prosecution's case. Simpson testified that Petitioner shot Miller and cut off his ear. Zantello testified that she heard Simpson say to Petitioner that he almost blew off someone's head and that Petitioner later apologized for what they had done. Although Lamp also implicated Petitioner in the murder, the fact that Lamp "testified to a particular fact . . . does not render other testimony on that point 'cumulative.'" *Vasquez*, 496 F.3d at 576.

It was Simpson, moreover, who observed Petitioner raise the gun and shoot Miller. Lamp merely testified that Petitioner was holding the gun after he heard a gunshot. *Cf.* Tr. Apr. 12, 2001, at 65 and 89 (Simpson's testimony) with Tr. Oct. 16, 2002, at 204-05 (Lamp's testimony). Furthermore, Lamp admitted that he was the one to suggest that he and Petitioner shoot and kill Miller. He also supplied the murder weapon (Tr. Oct. 16, 2002, at 186-88, 198), and he testified pursuant to a favorable plea agreement. Because the jury could have questioned Lamp's credibility, Simpson's testimony was critical to the prosecution.

20

*Blackston v Rapelje*, 09-14766

Although defense counsel was permitted to cross-examine Simpson and Zantello at the first trial about prior statements in which they stated that Petitioner was not involved in the murder, counsel was not permitted to produce evidence of the recanting statements at the second trial. The statements were critical to Petitioner's defense. The trial court permitted little *effective* cross-examination by excluding the recanting statements. Had Petitioner been able to impeach Simpson's and Zantello's prior testimony with their recanting statements, the jury might have had a different opinion of their credibility at trial. *Van Arsdall*, 475 U.S. at 680.

Zantello, for example, was living with Petitioner when she informed the police that Petitioner was at home when she returned from the hospital and that Petitioner was not involved in the crime. In the words of the Michigan Court of Appeals,

> [t]he jury could have easily decided that the earlier inconsistent statements did not undermine the trial testimony, reasoning that Zantello had given a statement in March, 1990 that incriminated [Petitioner], and that at the time of trial, Zantello was no longer involved with [Petitioner], and was therefore no longer willing to lie in his behalf. The fact that Zantello reaffirmed her earlier position shortly before the second trial would have undermined her trial testimony in a way that the earlier statements could not.

*Blackston*, 2005 WL 94796, at *8.

And even though Rebecca Krause Mock testified about a time when Petitioner admitted that he, Simpson, and Lamp had taken Miller to the woods and shot him, Mock conceded that they were drunk at the time and that she, too, was a suspect at one time. She also testified that someone else had threatened to kill Miller and that Petitioner had told her other stories about what happened to Miller. (Tr. Oct. 16, 2002, at 17-22, 30, 32, 40, 49-50.) Roxanne Krause Barr

21

*Blackston v Rapelje*, 09-14766

also testified about Petitioner's admission, but she thought that Petitioner had said Lamp shot

Miller. (*Id*. at 63).

> To conclude, the evidence against Petitioner was not overwhelming, and
>
> [a]ll the prosecutor's witnesses had compelling motives to lie. Simpson, Lamp,
> and Mock were all suspects. Zantello was [Petitioner's] ex-girlfriend and,
> according to Zantello, her then-current boyfriend, who beat her, forced her to
> testify against [Petitioner] because the prosecutor – the same prosecutor
> prosecuting [Petitioner's] case – allegedly promised the boyfriend no prison time
> if she did so.

*Blackston*, 481 Mich. at 491 (Markman, J., dissenting).

Petitioner's defense was far less persuasive than it might have been had he been given an

opportunity to impeach Simpson's and Zantello's prior testimony with their recanting

statements. Consequently, the Court doubts that the trial court's decision to prevent Petitioner

from admitting evidence of Simpson's and Zantello's recanting statements was harmless error.

Instead, the error likely had a "substantial and injurious effect or influence in determining the

jury's verdict." *Brecht,* 507 U.S. at 623. Under the circumstances, Petitioner must win. *O'Neal,*

513 U.S. at 436. The Court therefore GRANTS the writ of habeas corpus on Petitioner's first

and second claims.

**B.  The Unavailability of Simpson and Zantello and the Admission of Their Prior
Testimony** (habeas claims three, seven, and nine)

The Court will briefly discuss Petitioner's remaining claims. He alleges that the trial

court abused its discretion and misinterpreted the Michigan Rules of Evidence when it

determined that Simpson and Zantello were unavailable to testify at his second trial and that their

testimony at his first trial could be read into the record. The Michigan Court of Appeals

22

*Blackston v Rapelje*, 09-14766

disagreed, ruling that the trial court did not err by declaring Simpson and Zantello unavailable

and that the constitutional test for the admissibility of prior testimony was satisfied, at least with

respect to Simpson's testimony.

### 1. Unavailability of Witnesses

Petitioner contends that the trial court should have ordered Simpson and Zantello to

testify before declaring them unavailable. This argument is based on Michigan Rule of Evidence

804, which states, among other things, that the unavailability of a witness includes situations

where the declarant "persists in refusing to testify concerning the subject matter of the

declarant's statements *despite an order of the court to do so*." Mich. R. Evid. 804(a)(2)

(emphasis added).

A federal habeas court may not overturn a state court's decision on the question of

unavailability merely because additional steps might have been taken to make the witness

available. *Hardy v. Cross*, __ U.S. __, __, 132 S. Ct. 490, 495 (2011). Under AEDPA's

deferential standard of review, "if the state-court decision was reasonable, it cannot be

disturbed." *Id.*

The trial court's decision – that Simpson was unavailable – was reasonable for the

reasons given by the Michigan Court of Appeals:

> Simpson appeared at defendant's second trial but initially refused to testify until
> he had an opportunity to confer with his counsel. The trial court granted Simpson
> time to do so; thereafter, Simpson refused to testify unless he was given the
> opportunity to take a shower.[5] Simpson repeatedly refused to testify,

---

[5] Simpson was being held in jail on unrelated charges, and asserted that he had not been
given an opportunity to shower while at the jail.

23

*Blackston v Rapelje*, 09-14766

notwithstanding the trial court's attempts to accommodate him. A trial court is not required to threaten a witness with contempt before finding him unavailable to testify. *People v. Burgess*, 96 Mich. App. 390, 401; 292 NW2d 209 (1980). Simpson's counsel informed the trial court that he believed Simpson would jeopardize his grant of immunity by testifying[6] and implied that he (counsel) would advise Simpson to assert his Fifth Amendment privilege if called. A witness who asserts a Fifth Amendment privilege is unavailable to testify for purposes of MRE 804(a). *People v. Meredith*, 459 Mich. 62, 65-66; 586 NW2d 538 (1998).

*Blackston*, 2008 WL 4604393, at *2 (footnotes in original, numbered as 3 and 4); *see also* Tr.

Oct. 15, 2002, at 134-42, 147.)

The trial court's decision that Zantello was unavailable likewise was reasonable. As

explained by the Michigan Court of Appeals,

Zantello stated that she could not recall the events surrounding Miller's disappearance in 1988 and could not recall her testimony at the first trial. The trial court's comments indicate that it found Zantello's protestations of lack of memory to be less than credible. In addition to Zantello repeatedly stating that she could not remember either the events surrounding Miller's disappearance or her testimony from the first trial, she also repeatedly stated that she wished to avail herself of her Fifth Amendment protections.

*Blackston*, 2008 WL 4604393, at *7; *see also* Tr. Oct. 16, 2002, at 81-95. The trial court and the

Michigan Court of Appeals reasonably determined that Zantello and Simpson were unavailable

to testify.

## 2. The Right of Confrontation

The remaining question is whether the admission of Simpson's and Zantello's prior

testimony violated Petitioner's right to confront the witnesses against him. The Supreme Court

---

[6] Apparently, Simpson's counsel had learned that Simpson intended to testify differently from what he had at the first trial.

24

*Blackston v Rapelje*, 09-14766

held in *Crawford v. Washington*, 541 U.S. 36, 68 (2004), that testimonial evidence may not be introduced against a defendant in a criminal trial unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. "Testimonial" evidence includes, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

Simpson's and Zantello's testimony at Petitioner's first trial qualified as "testimonial" evidence because it was testimony at an earlier trial. Petitioner had a full opportunity to cross-examine Simpson and Zantello at his first trial, and, as previously explained, both witnesses were unavailable at Petitioner's second trial. Thus, their testimony at the first trial was admissible at Petitioner's second trial, and the Confrontation Clause was not violated.

**C. the Failure to Delete the Discussion on Immunity
    and the Reference to the First Trial** (habeas claim eight)

At Petitioner's first trial, Simpson and the trial court had a discussion regarding whether Simpson was offered use immunity or transactional immunity. Simpson thought that he had been offered complete immunity from prosecution in return for truthful testimony about Miller's death, whereas the trial court thought that Simpson had immunity from the use of his testimony, not complete transactional immunity. (Tr. Apr. 12, 2001, at 108, 113-17.)

When Simpson's testimony from the first trial was read into the record at Petitioner's second trial, the discussion about Simpson's immunity agreement was included. According to Petitioner, the jury might have concluded from the discussion that the court was expressing its opinion of Simpson's credibility. The Michigan Court of Appeals, however, determined that the

25

*Blackston v Rapelje*, 09-14766

failure to redact the discussion regarding the scope of Simpson's immunity was not an abuse of discretion.

Even assuming that Petitioner has raised a constitutional issue, his claim lacks merit, because, after the trial court ruled that Simpson's prior testimony was admissible, defense counsel asked to have "every single word" of Simpson's prior testimony read into the record. (Tr. Oct. 15, 2002, at 150-51)  Further, the trial court explained to Petitioner's jury that Simpson's understanding of the immunity agreement was correct and that Simpson was promised total immunity.  (*Id*. at 154-55.)  Under the circumstances, the court's failure to redact the discussion on immunity did not deprive Petitioner of a fair trial.  The mention of a previous jury trial also did not violate Petitioner's rights to due process and a fair trial, because the reference was fleeting and isolated, and the trial court did not mention that Petitioner was found guilty at the prior trial.

**D.  Excluding Potential Defense Witnesses** (habeas claim ten)

Petitioner alleges that the trial court abused its discretion and deprived him of due process and a fair trial when it excluded testimony from several potential defense witnesses. According to Petitioner, the witnesses would have testified that, before trial,  Lamp and Simpson made statements inconsistent with their trial testimony.  Petitioner asserts that the trial court's refusal to allow him to present this evidence violated the Michigan Rules of Evidence and his right to defend himself against the State's accusations.

The trial court excluded extrinsic evidence of Lamp's prior inconsistent statements on the ground that Lamp was not given an opportunity to explain his prior statement when he testified.

26

*Blackston v Rapelje*, 09-14766

(Tr. Oct. 17, 2002, at 12-13.)  The trial court excluded extrinsic evidence of Simpson's prior inconsistent statements on the ground that there were no indicia of trustworthiness in the evidence.  (*Id*. at 13-14.)

The Michigan Court of Appeals concluded that any error with respect to Simpson was harmless.  With respect to Lamp, the Court of Appeals opined that the trial court did not abuse its discretion because the offer of proof as to one potential witness (Linda Johnson) was vague and context dependent.  The Court of Appeals determined that affidavits from the other three witnesses (Donald Ford, Henry Dale Kirby, and Corey Leadingham) consisted of mere allegations of threats or violence, which would have been inadmissible character evidence.  The court of appeals also stated that the evidence was not relevant to impeach Lamp's testimony and that it was subject to exclusion as being unfairly prejudicial and irrelevant.

### 1.  Clearly Established Federal Law

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)), but "[a] defendant's right to present relevant evidence is not unlimited . . . ."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  The right "is subject to reasonable restrictions."  *Id*.

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . . [T]he Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

27

*Blackston v Rapelje*, 09-14766

*Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quotation marks and citations omitted) (end bracket in original).

### 2. Application

#### a. Impeachment Evidence Regarding Lamp

Petitioner alleges that Donald Ford, Henry Dale Kirby, and Corey Leadingham would have testified that Lamp informed them that he (Lamp) killed Miller, and Linda James Johnson would have testified that Lamp informed her that Petitioner was not involved in the murder. Although this potential evidence was inconsistent with Lamp's trial testimony, Lamp admitted at trial that he was serving a sentence of ten to fifteen years in prison for his role in the murder (Tr. Oct. 16, 2002, at 179-80), and Ms. Johnson testified that Petitioner was at home when the murder supposedly occurred.  (Tr. Oct. 17, 2002, at 102.)  Thus, excluding additional evidence that Lamp, and not Petitioner, killed Miller could not have had a substantial and injurious effect or influence on the jury's verdict and was harmless.  *Brecht,* 507 U.S. at 623.

#### b. Impeachment Evidence Concerning Guy Carl Simpson

Petitioner claims that Shirley Gargus, Jeff Pare, John Reed, and Elijah Ford would have testified that Simpson informed them that Lamp murdered Miller or that Petitioner was not present during the crime.  Simpson, however, admitted at Petitioner's first trial that he had told many different stories about the crime, including a version that only he and Lamp committed the crime.  (Tr. Apr. 12, 2001, at 106.)

Furthermore, Elijah Ford testified at Petitioner's first trial that Simpson had said he (Simpson) and Lamp were the only ones present at the murder and that Petitioner was not there.

28

*Blackston v Rapelje*, 09-14766

(Tr. Apr. 13, 2001, at 4.)  Petitioner's first jury convicted him as charged despite this exculpatory evidence.  The Court concludes that, to the extent Petitioner was deprived of his right to present a defense by the exclusion of potential defense witnesses, the constitutional error was harmless.

**E.  Double Jeopardy** (habeas claim five)

As previously explained, the trial court granted Petitioner a second trial on the ground that the court misinformed Petitioner's jury about the extent of the prosecution's grant of immunity to Simpson.  Petitioner contends that being tried a second time violated his rights under the Double Jeopardy Clauses of the state and federal constitutions.  Petitioner states that the prosecutor provoked a mistrial by not informing the trial court during his first trial that Simpson was granted complete immunity for his testimony at Petitioner's trial. The Michigan Court of Appeals determined that this claim was unpreserved, but that it also failed on the merits.

### 1.  Clearly Established Federal Law

The Double Jeopardy Clause of the Fifth Amendment provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."  U.S. CONST. amend. V.   The Clause is "applicable to the States through the Fourteenth Amendment," *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988), and it "protects a criminal defendant from repeated prosecutions for the same offense."  *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982) (citing *United States v. Dinitz*, 424 U.S. 600, 606 (1976)).

The Clause also "protect[s] a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions."  *Dinitz*, 424 U.S. at 611.  In other words, "where 'the conduct giving

29

*Blackston v Rapelje*, 09-14766

rise to the [defendant's] successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial,' the defendant 'may invoke the bar of double jeopardy in a second effort to try him.'" *Phillips v. Ct. of Common Pleas, Hamilton Cnty., Ohio*, 668 F.3d 804, 811 (6th Cir. 2012) (citing *Kennedy*, 456 U.S. at 679).

Although a defendant also has a "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter*, 336 U.S. 684, 689 (1949), that right "is not absolute, and the Clause does not guarantee that the state's interest in enforcing the criminal laws against a defendant will be vindicated in a single trial." *Phillips*, 668 F.3d at 811(citing *Kennedy*, 456 U.S. at 673). "[T]he Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." *Nelson*, 488 U.S. at 38; *see also Phillips*, 668 F.3d at 811 (stating that, "where a trial is terminated at the defendant's urging, the Double Jeopardy Clause does not bar a retrial").

### 2. Application

Petitioner was tried a second time for the same offense, but he sought a new trial after his first trial and his request was granted.  He may not complain that he got the new trial which he requested.  *See Kennedy,* 456 U.S. at 676 ("A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.'") (quoting *United States v. Scott*, 437 U.S. 82, 93 (1978)).

Further, there is no evidence that the prosecutor goaded Petitioner into moving for a new trial.  Although the prosecutor apparently knew that Simpson was granted transactional

*Blackston v Rapelje*, 09-14766

immunity,[7] "[a]t worst, [he] failed to correct the misapprehension of the trial court regarding the extent of immunity granted to Simpson." *Blackston*, 2008 WL 4604393, at *6. A prosecutor's negligence is not enough to meet the narrow exception to retrial, and when, as here, the prosecutor gained no advantage by the grant of a new trial, it is even less likely that he goaded the defendant into seeking a new trial. *Phillips*, 668 F.3d at 813. Thus, Petitioner's double jeopardy claim lacks merit.

**F. The Prosecutor** (habeas claim eleven)

Petitioner claims that the prosecutor committed misconduct by vouching for his witnesses and by calling Petitioner a cold-blooded murderer. The Michigan Court of Appeals reviewed this claim for "plain error" because Petitioner did not object at trial. The court of appeals concluded that the prosecutor's remarks were proper when viewed in context and that the alleged errors did not warrant reversal.

**1. Clearly Established Federal Law**

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). To prevail on a prosecutorial-misconduct claim, a habeas petitioner must demonstrate that the prosecutor's conduct infected his trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The misconduct must have been "so

---

[7] The prosecutor stated in his opening statement at Petitioner's first trial that Simpson was testifying under a grant of immunity and that Simpson could not be prosecuted for any participation he had in Miller's death. (Tr. Apr. 10, 2001, at 80.)

31

*Blackston v Rapelje*, 09-14766

egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d

117, 119 (6th Cir. 1979). Federal courts in this Circuit

> apply a "two-part test to determine whether the state court reasonably applied the
> federal standard in holding that prosecutorial misconduct did not render [the
> petitioner's] trial fundamentally unfair." *Irick v. Bell*, 565 F.3d 315, 324 (6th Cir.
> 2009). [Courts] first determine whether the prosecution's conduct was improper.
> *Id*. Second, [courts] determine whether that improper conduct was flagrant by
> considering four factors: "(1) whether the evidence against the defendant was
> strong; (2) whether the conduct of the prosecution tended to mislead the jury or
> prejudice the defendant; (3) whether the conduct or remarks were isolated or
> extensive; and (4) whether the remarks were made deliberately or accidentally."
> *Id*. (internal quotation marks omitted).

*Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012), *cert. denied*, __ S. Ct. __, No. 12-

5231, 2012 WL 2872595 (U.S. Oct. 1, 2012).

### 2. Characterizing Petitioner as a Murderer

During his opening statement, the prosecutor stated that he did not "mean to paint Mr.

Lamp as anything other than a cold-blooded murderer, just like Mr. Blackston, because that's

what they are." (Tr. Oct. 15, 2002, at 107.) Prosecutors may not interject their personal beliefs

into the presentation of their cases, *United States v. Young*, 470 U.S. 1, 8-9 (1985), nor express

personal opinions on the guilt of a defendant, *Hall v. Vasbinder*, 563 F.3d 222, 235 (6th Cir.

2009). But the disputed comment here was an isolated one and likely did not mislead the jury,

because the trial court informed the jurors that Petitioner was presumed innocent, that the

prosecutor had to prove each element of the crime beyond a reasonable doubt, and that the

attorneys' arguments were not evidence. (Tr. Oct. 17, 2002, at 183-84; Tr. Oct. 15, 2002, at 99.)

Even assuming that the remark was improper, it did not amount to flagrant misconduct. *Cf.*

*Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (prosecutor's comment during closing

32

*Blackston v Rapelje*, 09-14766

argument that the defendant was a murderer and artful liar, while questionable, was essentially a

commentary on a credibility issue and did not rise to the level of a constitutional violation);

*United States v. Pungitore*, 910 F.2d 1084, 1127 (3d Cir. 1990) (the prosecutor's reference to a

defendant as a cold-blooded murderer was a fair comment on the evidence).

### 3. Vouching

The alleged vouching occurred during closed arguments when the prosecutor said:

> [W]hat motivation, if any, was there [for Simpson] to point the finger at Junior
> Fred Blackston if Mr. Blackston wasn't involved.  This was Guy Carl Simpson's
> good buddy.  They were good friends.  If he's going to point the finger at
> anybody under those circumstances, I would suggest that it would be Charles
> Dean Lamp as far as being the trigger man, but the bottom line is all three of them
> were there and as far as the involvement of Mr. Blackston and Mr. Lamp, I don't
> believe that there is any question at all as far as what their involvement was, what
> Mr. Blackston's involvement was and what he's guilty of.
>
> The other thing to consider is the testimony of Dean Lamp. . . .
>
> But, again, I think you need to look at what, if any, motivations that Mr.
> Lamp has . . . , and I would suggest that there is nothing about his story to
> indicate that he's not gelling us the truth.

(Tr.  Oct. 17, 2002, at 148-49.)

Petitioner interprets these comments as an expression of the prosecutor's personal

knowledge and belief in Lamp's and Simpson's credibility, but the prosecutor

was merely suggesting that his witnesses had no motive to lie.  This was not improper.  *United*

*States v. Coots*, 408 F. App'x 968, 974 (6th Cir. 2011).  Even if the quoted remarks were

improper, the trial court instructed the jurors that it was for them to decide which witnesses to

believe and how important their testimony was.  The court stated that the jurors could believe all,

none, or part of any person's testimony and that an accomplice's testimony, such as Lamp's

33

*Blackston v Rapelje*, 09-14766

testimony and perhaps Simpson's testimony, should be considered more cautiously than that of an ordinary witness. (Tr. Oct. 17, 2002, at 192-97.) Any impropriety in the prosecutor's remarks was not flagrant. Thus, Petitioner has no right to relief on the basis of his prosecutorial-misconduct claim.

**G. Trial Counsel** (habeas claims four, six, and twelve)

Petitioner alleges in habeas claim four that his trial attorney was ineffective for failing to object to (a) Zantello's hearsay testimony, (b) the trial court's jury instruction on perjury, and (c) a jury instruction on the order of deliberations. In habeas claim twelve, Petitioner alleges that trial counsel was ineffective for failing to (a) move to dismiss the murder charge with prejudice,[8] (b) object to several trial errors, (c) cross-examine and impeach key prosecution witnesses with prior inconsistent statements, (d) question a defense witness (Shirley Gargus) about Zantello's inconsistent statements, (e) call several defense witnesses to impeach Zantello and Simpson with inconsistent statements, and (f) offer character evidence to show that Zantello and Lamp had a reputation for dishonesty. The Michigan Court of Appeals determined that all of Petitioner's claims about his attorneys lacked merit, because there were no errors or the alleged errors were harmless.

### 1. Clearly Established Federal Law

Pursuant to *Strickland v. Washington,* 466 U.S. 668 (1984), Petitioner must demonstrate that his attorney's "performance was deficient" and "that the deficient performance prejudiced

---

[8] Petitioner makes the same allegation about appellate counsel in claim six.

*Blackston v Rapelje*, 09-14766

the defense." *Id*. at 687.  The same standard applies to claims about appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694 .  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (internal and end citations omitted).

### 2.  Failure to Object to Zantello's Hearsay Testimony

Petitioner asserts that his trial attorney should have objected to Zantello's testimony that, on the night of the murder, she heard Simpson say to Petitioner, "You almost blew his whole head off."  The Michigan Court of Appeals agreed with Petitioner that this comment was inadmissible hearsay.  The court of appeals nonetheless concluded that counsel's failure to object did not prejudice Petitioner.

35

*Blackston v Rapelje*, 09-14766

Given the properly admitted testimony of other witnesses, the result of the trial would not have been different had counsel objected and prevented the introduction of this portion of Zantello's testimony.  Zantello, moreover, testified that she was half asleep at the time and that Petitioner and Simpson could have talking about a movie or video or blowing off a dog's head. (Tr. Apr. 10, 2001, at 203-04.)  And Simpson admitted during his testimony that he may have said to Petitioner that he "couldn't believe it when that guy was shot and all the blood and stuff like that."  (Tr. Apr. 12, 2001, at 94.)  In light of Simpson's comment, as well as Zantello's uncertain testimony and the other evidence against Petitioner, counsel's failure to object did not prejudice the defense.

### 3.  Failure to Object to the Trial Court's Jury Instructions

Petitioner contends that trial counsel should have objected to the trial court's instruction on perjury and on the order of deliberations.

#### a.  Perjury

The trial court began its charge to the jurors by stating that it wanted to clarify the law on the crime of perjury.  The trial court noted that there had been references at trial to people who had a motive to lie or to tell the truth because they might be prosecuted for perjury.  The court then proceeded to read the statute on perjury and to explain the penalties for the crime so that the jurors could properly weigh the witnesses' motives for telling the truth or not telling the truth while testifying under oath in a court of law.  (Tr. Oct. 17, 2002, at 181-82.)

Petitioner concedes that the instruction was an accurate statement of the law.  He nevertheless claims that the instruction directed the jury's attention to Simpson's motivation for

36

*Blackston v Rapelje*, 09-14766

telling the truth.  The Michigan Court of Appeals determined on review of Petitioner's claim that

the trial court acted within its discretion by instructing the jury on perjury.

The trial court did not mention Simpson or any other witness by name during its

instruction on perjury, and, during closing arguments, both the prosecutor and defense counsel

discussed the witnesses' motives for testifying the way they did.  (*Id*. at 144, 148-49, 153-57,

164, 178-79.)  The trial court therefore did not deprive Petitioner of a fair trial by reading the

instruction on perjury, and defense counsel was not ineffective for failing to object to the *sua*

*sponte* instruction.

### b.  First- and Second-Degree Murder

Petitioner objects to the following jury instruction, which the trial court read as it handed

the verdict form to the jurors:

> If you have a reasonable doubt as to either possibility [first-degree murder
> or second-degree murder], your verdict will be not guilty.  If you find beyond a
> reasonable doubt all four elements of first degree murder have been demonstrated,
> your verdict would be guilty as charged.  If you find there is no deliberation or
> premeditation, but there was a second degree murder, your verdict would be
> guilty of second degree murder.

(*Id*. at 199.)

Petitioner contends that this instruction foreclosed the jury from finding him guilty of

second-degree murder.  Petitioner relies on *People v. Handley*, 415 Mich. 356, 361 (1982), in

which the Michigan Supreme Court held that jurors should be instructed that, if they failed to

convict or acquit or were unable to agree on whether the defendant was guilty of the principal

charge, they could consider a lesser offense.  The alleged violation of state law is not a basis for

habeas corpus relief, *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and the instruction quoted

37

*Blackston v Rapelje*, 09-14766

above did not foreclose the possibility of finding Petitioner guilty of second-degree murder.  The trial court's instructions as a whole informed the jury that they could find Petitioner not guilty, guilty of first-degree murder, or guilty of second-degree murder.  (Tr. Oct. 17, 2002, at 184-89, 199.)  Therefore, defense counsel was not ineffective for failing to object to the instruction on first- and second-degree murder.

### 4.  Failure to Make a Double Jeopardy Argument

Petitioner alleges that his trial and appellate attorneys were ineffective for failing to move to dismiss the murder charge on double jeopardy grounds.  As discussed above, Petitioner's second trial did not violate his rights under the Double Jeopardy Clause.  Therefore, trial and appellate counsel were not ineffective for failing to argue that the murder charge should be dismissed with prejudice.

### 5.  Failure to Object to Trial Errors

#### a.  Failure to Object to the Admission of Simpson's and Zantello's Prior Testimony

Petitioner states that his trial attorney was ineffective for failing to object to the reading of Simpson's and Zantello's prior testimony at his second trial.  The record indicates that defense counsel did object to the reading of Simpson's prior testimony.  (Tr. Oct. 15, 2002, at 142-44, 146.)  And by the time Zantello took the stand, the trial court had ruled that Simpson's testimony from Petitioner's first trial could be read into the record.  Zantello, moreover, maintained that she did not wish to testify because she could not remember anything.  An objection to the reading of Zantello's prior testimony would have been futile, and an attorney is not constitutionally

*Blackston v Rapelje*, 09-14766

ineffective for failing to make a futile objection.  *Harris v. United States*, 204 F.3d 681, 683 (6th

Cir. 2000).

### b.  Failure to Object to the Prosecutor's Conduct and the Exclusion of Impeachment Evidence

Petitioner claims that defense counsel was ineffective for failing to object to the

prosecutor's conduct and to the exclusion of potential defense witnesses who could have

impeached Lamp and Simpson with their prior statements.  For the reasons given above, the

prosecutor's conduct either was not improper or the alleged impropriety was not flagrant.

As for the exclusion of potential defense witnesses, defense counsel opposed the

prosecutor's motion to prevent defense counsel from introducing the evidence.  Defense counsel

also volunteered to make an offer of proof pertaining to the evidence.  She maintained that the

evidence was valid impeachment evidence and was admissible as statements against interest.

(Tr. Oct. 17, 2002, at 6-12.)  Petitioner's claim that defense counsel failed to object to the

exclusion of impeachment evidence is not supported by the record.

### c.  Failure to Cross-Examine and Impeach Witnesses

Petitioner alleges that his trial attorney should have impeached Simpson, Lamp, and

Zantello with their prior inconsistent statements that Lamp killed Miller and that Petitioner was

at home at the time.  Defense counsel did question Lamp about his prior inconsistent statement

that he told the police the only plan was to raid a marijuana field.  (Tr. Oct. 16, 2002, at 219.)

Defense counsel also questioned Simpson about his prior inconsistent statements.

Simpson admitted on cross-examination by defense counsel at the first trial that he once said that

he and Lamp were the only people involved in the killing and that someone other than Petitioner

39

*Blackston v Rapelje*, 09-14766

committed the crime.  (Tr. Apr. 12, 2001, at 106-07.)  Defense counsel elicited additional

testimony from Simpson that he previously told different stories to benefit himself.  (*Id*. at 121.)

Defense counsel asked Zantello about her prior inconsistent statements, as well.

Specifically, defense counsel asked Zantello whether she told the police in 1990 that Petitioner

was not involved in the crime.  Zantello responded that, although she did not recall saying that,

she may have made the remark.  (Tr. Apr. 10, 2001, at 217.)   The Court concludes that defense

counsel's cross-examination and impeachment of key witnesses was adequate and did not

amount to deficient performance.

### d.  Failure to Question Gargus about Zantello's Prior Statements

Petitioner alleges that his trial attorney should have asked her own witness, Shirley

Gargus, about Zantello's inconsistent statements.  Petitioner claims that Gargus would have said

that Zantello admitted to telling many untrue stories about Petitioner over the years and that

Zantello had said Petitioner was home when she returned from the hospital on the night of the

murder.

Although defense counsel did not question Gargus about Zantello's prior inconsistent

statements, defense counsel elicited comparable testimony from Detective Sergeant Dana

Averill.  Sergeant Averill testified on cross-examination by defense counsel that:  Zantello

informed him in 1989 that she did not know anything about the murder and that Petitioner was

not involved with the murder (Tr. Oct. 16, 2002, at 162-63); Zantello informed him in 1990 that

Petitioner and Simpson were at her home when she returned from the hospital on the night of the

crime (*id*. at 163-64, 167); and the initial tip which Sergeant Averill received was that Simpson

40

*Blackston v Rapelje*, 09-14766

was the shooter (*id*. at 165). Defense counsel was not ineffective for failing to ask Gargus about the same or similar matters.  Counsel used Gargus to establish that Petitioner actually was at home at the time of the murder.  (Tr. Oct. 17, 2002, at 82-85.)

### e.  Failure to Produce Additional Witnesses

Petitioner claims that defense counsel should have produced additional witnesses to impeach Zantello and Simpson with their inconsistent statements and to offer character evidence showing that Zantello and Lamp were known to be dishonest.  Defense counsel produced some of the witnesses suggested by Petitioner at Petitioner's first trial and the jury convicted him of first-degree murder despite the witnesses' testimony.  Therefore, Petitioner cannot establish ineffective assistance of counsel with respect to producing witnesses to impeach Zantello and Simpson.

As for Lamp,

[c]ounsel brought to the jury's attention Lamp's self-interest in implicating [Petitioner] in Miller's murder.  Moreover, counsel cross-examined Lamp about various inconsistent statements.  Furthermore, given that the presentation of character evidence against Lamp was unsuccessful at [Petitioner's] first trial, it is likely that defense counsel (who also represented [Petitioner] at the first trial) made a strategic decision to forego offering such evidence at the second trial and to concentrate on creating doubts about Lamp's testimony because of his plea agreement.

*Blackston*, 2008 WL 4604393, at *10.

For the reasons given by the state court, defense counsel was not ineffective for failing to produce witnesses to impeach Lamp's character.  And for all the reasons given above, the state court reasonably applied *Strickland* to Petitioner's ineffective-assistance-of-counsel claims.

41

*Blackston v Rapelje*, 09-14766

**H.  Cumulative Effect of Errors** (habeas claims twelve (G) and thirteen)

Petitioner claims that the cumulative effect of his attorney's errors and the trial errors deprived him of his right to due process and a fair trial.  The Michigan Court of Appeals found no merit in these claims, because any errors that did occur were minor and did not deprive Petitioner of due process or a fair trial.

According to the United States Court of Appeals for the Sixth Circuit, a claim that  the cumulative effect of errors rendered the petitioner's trial fundamentally unfair is not cognizable on habeas review.  *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct. 2751 (2012).  Petitioner therefore has no right to relief on the basis of claims twelve (G) and thirteen.

## IV.  CONCLUSION

Petitioner's constitutional right to due process and his right to confront the witnesses against him were violated by the trial court's denial of Petitioner's request to impeach Simpson's and Zantello's prior testimony with their recanting statements.  Further, the state supreme court's adjudication of Petitioner's first and second claims was contrary to *Davis, Chambers*, and *Van Arsdall*, cases in which the defendant was prohibited from introducing critical evidence to impeach key prosecution witnesses.    Accordingly, the Court **GRANTS** a conditional writ of habeas corpus on habeas claims one and two.  The State shall release Petitioner unless it takes steps to retry him within ninety days of the date of this opinion and order.

*Blackston v Rapelje*, 09-14766

The state appellate court's adjudication of Petitioner's remaining claims was objectively reasonable.  Accordingly, the Court denies relief on claims three through thirteen, and declines to grant a certificate of appealability on those claims.


S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: December 5, 2012

I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on December 5, 2012, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary

43